Date signed July 12, 2010



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

In re:                                    *

James Paul Pare,                          *        Case No. 08-25885
                                          *
           Debtor                         *        Chapter 7
                                          *
                                          *
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \* \* \* \* \* \* \* \* \* \* \*

Edward Augustine and Lisa Augustine,      *
                                          *
           Plaintiffs                     *
                                          *
vs.                                       *        Adversary No. 09-00173
                                          *
                                          *
James Paul Pare,                          *
                                          *
           Defendant                      *
                                          *
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF DECISION

This adversary proceeding was commenced by the filing of a two-count Complaint to

Determine Dischargeability of Debt based on 11 U.S.C. §§523(a)(2)A) and (a)(4).  Plaintiffs

Edward Augustine ("Augustine") and Lisa Augustine (collectively "Plaintiffs") seek a

determination that a debt from debtor James Paul Pare ("Defendant") should be excepted from

discharge under 11 U.S.C. §523(a)(2)(A) and (a)(4).  The Court held a trial on May 5, 2010.  For

the reasons set forth herein, the Court will deny relief and dismiss the complaint.

## FACTS

On October 21, 2006, Plaintiffs entered into a Custom Home Construction Agreement

(the "Contract") with PEI Construction and Custom Homes, LLC ("PEI") for the construction of

a single-family home at 8170 Hollow Road, Middletown, MD (the "Project").  Under the

Contract, PEI was required to complete the Project within one (1) year from the date of

execution of the Contract, for a total contract price of Seven Hundred Sixty Five Thousand

Dollars ($765,000.00) ("Contract Price").

In order to finance a portion of the Contract Price, Plaintiffs applied for and received a

commitment for a construction loan from Countrywide Home Loans, Inc. ("Lender") and

subsequently executed a Construction Loan Agreement ("Construction Loan") with the Lender.

The Construction Loan closed on November 30, 2006 and the loan was funded, subject to the

conditions set forth in the Construction Loan agreement.

The terms of the Construction Loan agreement required PEI to submit draw requests for

labor, services and/or materials provided to the Project.  A "Construction Loan Budget/ Cost

Breakdown Attachment for Direct Costs Line Item Detail" (hereinafter the "Draw Schedule")

was prepared by the Lender and signed by Defendant.  Thereafter, an initial payment of $76,000

was made by the Lender to PEI as required by the Contract and construction commenced in

March 2007.

On or about March 28, 2007, Defendant and Augustine met and Augustine

2

approved and signed the first of a series of documents titled "Draw Request and Mechanic's Lien Statement" (hereinafter "Draw Request"), which was also signed by Defendant. On March 28, 2007, Augustine also was asked by Defendant to sign a "Draw Delegated Authorization" ("Authorization"). The Authorization gave PEI permission to obtain future draws under the Construction Loan by wire transfer, without channeling future Draw Requests or disbursements through Plaintiffs. Future Draw Requests would be faxed or mailed directly to the Lender and draw disbursements would thereafter be wired directly to PEI's account without Plaintiffs' prior inspection of the Draw Request or advance approval of the disbursement.

A series of additional Draw Requests then followed as construction proceeded. There were nine separate Draw Requests including the first Draw Request signed by Augustine. Pursuant to the Authorization, the remaining eight Draw Requests were not signed by Plaintiffs, but were submitted to Countrywide directly by Defendant on behalf of PEI without prior approval by Plaintiffs and bearing only Defendant's signature. The Draw Requests were submitted to an employee of Countrywide, and disbursements were approved by Countrywide before they were made to PEI. Countrywide maintained a running account of all disbursements under the Construction Loan.

Plaintiffs allowed the Lender to continue to release draws and did not revoke the Authorization. Defendant did not send copies of the Draw Requests to Plaintiffs, and Plaintiffs were unaware of the amounts of the Draw Requests or the amounts funded by Countrywide in response to the Draw Requests.

Sometime in September 2007, Plaintiffs were notified by 84 Lumber that it was going to file a lien against the Project because its outstanding invoice of $68,000 was not paid. Plaintiffs

contacted Defendant, who told Plaintiffs that there must have been a clerical mistake and it would be cleared up.

On October 16, 2007, Plaintiffs learned from Countrywide that a lien had been placed against the Project on October 8, 2010. It was ultimately determined that funds from the Construction Loan were used to pay 84 Lumber (or others) on projects other than the Project.

In November 2007, PEI and Defendant, through counsel, notified Plaintiffs that PEI could not complete the Project for the Contract Price and requested that Plaintiffs pay PEI an additional $153,000.00 to complete the Project. Plaintiffs refused to pay the additional $153,000.00 above the Contract Price. Consequently, the parties parted ways, leaving the home unfinished.

Approximately eight subcontractors and/or material suppliers remained unpaid and threatened claims and/or mechanic's lien actions. Plaintiffs hired counsel to deal with these lien threats. The claims of the subcontractors were resolved without the need for Plaintiffs to pay anything other than legal fees. Plaintiffs were eventually forced to employ a new general contractor, at their own expense, to complete the construction of the Project.

On December 2, 2008, Defendant filed a voluntary Petition under Chapter 7 of the United States Bankruptcy Code initiating his bankruptcy proceeding, and this Adversary Proceeding was filed on March 26, 2009.

## CONCLUSIONS OF LAW

"The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an honest but unfortunate debtor." *Cohen v. De La Cruz*, 523 U.S. 213, 217 (1998). This policy is codified in 11 U.S.C. §523, which provides in pertinent part:

4

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-

* * *

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

* * *

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. §§523(a)(2)(A) and (a)(4).  While exceptions to discharge are narrowly interpreted to protect the purpose of providing debtors a fresh start, *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998), it is equally important to ensure that "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code."  *Foley & Lardner v. Biondo (In re Biondo),* 180 F.3d 126, 130 (4th Cir. 1999).  To prevail on a claim that a debt should be excepted from discharge under §523(a), a creditor must prove all necessary elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286-287 (1991) ("[W]e hold that the standard of proof for the dischargeability exceptions in 11 U.S.C. §523(a) is the ordinary preponderance-of-the-evidence standard.").

### Section 523(a)(2)(A)

Plaintiffs contend that Defendant made several misrepresentations to them upon which they relied to their detriment and, therefore, their claim against Defendant should be excepted from discharge under §523(a)(2).  Specifically, Plaintiffs contend that (1) Defendant misrepresented in a draw request that he had used the prior Construction Loan proceeds to pay subcontractors when in fact he had not done so; (2) while Plaintiffs were sitting in their previous house and discussing the Project with Defendant, Defendant told Plaintiffs he would build them a house as nice or nicer than their current home; and (3) Defendant told Plaintiffs they would be

5

reimbursed from the Construction Loan for appliances they purchased, and for a $4000 lighting

draw, but they were not reimbursed.  The Court will first address the legal standards governing

a §523(a)(2)(A) claim before turning to Plaintiffs' specific allegations.

*The elements of §523(a)(2)(A).*

Section 523(a)(2) initially requires that the debt be "for money, property, services, or an

extension, renewal, or refinancing of credit," and it does not except "simply any debt incurred as

a result of fraud but only debts in which the debtor used fraudulent means to obtain money,

property, services, or credit."  *Nunnery v. Rountree (In re Rountree),* 478 F.3d 215, 219 (4th Cir.

2007). [1]

If the threshold inquiry is answered affirmatively, namely, that Section 523(a)(2)(A)

applies to the subject debt, a plaintiff must still "prove four elements: (1) a fraudulent

misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the

plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation."  *Biondo*, *supra,* at

134**;** *Miller v. Cigna Ins. Co*., 311 B.R. 57, 61 (D. Md. 2004).  Each of these elements will be

addressed in turn.

Plaintiffs must show that Defendant made a fraudulent misrepresentation.  "A

misrepresentation can be any words or conduct which produce a false or misleading impression

of fact in the mind of another."  *In re Koep*, 334 B.R. 364, 372 (Bankr.D.Md. 2005) (citation

omitted).  Next, Plaintiffs must show that Defendant made the misrepresentation with intent to

---

[1] Generally, a corporate officer is not responsible for the contractual debts of a corporation.  *See In re Pontier*, 165 B.R. 797, 799 (Bankr. D. Md. 1994).  However, a corporate officer "may be held personally liable for his or her own fraudulent conduct committed on behalf of the corporation which causes injury to another."  *Id.  See also In re Colodner*, 147 B.R. 90, 95 (Bankr. S.D.N.Y. 1992) ("As a 100 percent shareholder of IPM, the debtor had sufficient financial interest in IPM so that the debt owed to the plaintiffs by IPM could qualify as money obtained by the debtor through fraud or false representations for purposes of 11 U.S.C. § 523(a)(2)(A)."); *In re Firestone*, 26 B.R. 706, 714-15 (Bankr. S.D. Fla. 1982).

deceive.  "Intent to deceive may be inferred by the circumstances, including whether the defendant knowingly or recklessly made false representations, which she should know would induce the plaintiff to rely on them." *Koep*, 334 B.R. at 372.  "However, the recklessness must exceed negligence and rise to the level of reckless disregard for truth." *In re Kahler*, 187 B.R. 508, 513 (citations omitted).[2]

Next, Plaintiffs must show that harm resulted as a proximate cause of the misrepresentation.  "It is axiomatic that in the context of a claim for exception to discharge under Section 523(a)(2)(A), the harm or damage is the provision of credit." *Biondo*, *supra*, at 135. And finally, Plaintiffs must prove that they justifiably relied on the misrepresentation. "Justification is a matter of the qualities and characteristics of the particular plaintiff and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field v. Mans*, 516 U.S. 59, 71 (1995).  Although a "defendant who has been guilty of conscious misrepresentation cannot offer as a defense the plaintiff's failure to . . . verify" the representation, a plaintiff is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* (quoting Restatement (Second) of Torts (1976) § 541, Comment a).

*Defendant's alleged misrepresentations.*

---

[2] It is well established that recklessness can be sufficient to satisfy a plaintiff's burden on this factor.  "[T]he substantive terms in §523(a)(2)(A) refer to common law torts . . . and imply elements that the common law has defined them to include." *Field v. Mans*, 516 U.S. 59, 69 (1995).  "At common law reckless behavior was sufficient to support causes of action sounding in fraud or deceit." *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir.), *cert. denied*, 434 U.S. 875 (1977).

Defendant obtained draws under the Construction Loan by submitting Draw Requests to Countrywide.  From March 28, 2007 through September 17, 2007, Defendant submitted nine Draw Requests to Countrywide totaling $619,515.  After receipt of a Draw Request, Countrywide inspected the work and paid only the portion of the Draw Request it determined was appropriate.  Of the $619,515 in Draw Requests submitted by Defendant, Countrywide funded $491,850.  The dates and amounts of the Draw Requests and Countrywide's funding of them are as follows:

<table>
<tr><td colspan="3">DEFENDANT'S DRAW REQUESTS</td><td colspan="2">COUNTRYWIDE DRAW FUNDINGS[3]</td></tr>
<tr><td>DATE</td><td>EXHIBIT</td><td>AMOUNT</td><td>DATE</td><td>AMOUNT</td></tr>
<tr><td>3/28/2007</td><td>4</td><td>$ 133,875</td><td>3/29/2007</td><td>$ 117,000</td></tr>
<tr><td>4/11/2007</td><td>5</td><td>$ 34,000</td><td>4/12/2007</td><td>$ 34,000</td></tr>
<tr><td>4/23/2007</td><td>6</td><td>$ 115,825</td><td>4/27/2007</td><td>$ 96,000</td></tr>
<tr><td>5/1/2007</td><td>7</td><td>$ 66,500</td><td>5/4/2007</td><td>$ 66,500</td></tr>
<tr><td>5/29/2007</td><td>8</td><td>$ 93,975</td><td>5/30/2007</td><td>$ 58,000</td></tr>
<tr><td>6/22/2007</td><td>9</td><td>$ 34,875</td><td>6/27/2007</td><td>$ 14,000</td></tr>
<tr><td>7/12/2007</td><td>10</td><td>$ 54,375</td><td>7/18/2007</td><td>$ 41,370</td></tr>
<tr><td>8/28/2007</td><td>11</td><td>$ 61,545</td><td>8/30/2007</td><td>$ 61,545</td></tr>
<tr><td>9/17/2007</td><td>12</td><td>$ 24,545</td><td>9/24/2007</td><td>$ 3,435</td></tr>
<tr><td></td><td>TOTAL</td><td>$ 619,515</td><td>TOTAL</td><td>$ 491,850</td></tr>
</table>

Thus, Plaintiffs received the benefit of $619,515 of work performed on the Project for which they paid $491,500.[4]  Plaintiffs do not contend the work was not performed properly or had to be redone.  It is clear that Defendant grossly underbid the Contract Price and did not

---

[3] The amounts of the Countrywide Draw Fundings are taken from Joint Stipulated Ex. 14, which is Countrywide's Loan Statement from December 2006 through February 2008.  It is apparent from reviewing Ex. 14 that Countrywide advanced on or about the first of each month an amount sufficient to make the required loan payment for that month.  *See, e.g.*, entry for 7/02/07 for "Subsequent Draw" of $5.016.84 and entry for 07/02/07 for "Regular Payment" for $5,016.84.  In Ex. 15, Plaintiffs included some of the draws that were used to make loan payments in their calculation of amounts paid to Defendant, but those amounts are not included here because they were not received by Defendant.  *Compare* Ex. 15, entries in "Amount Paid" Column, with Ex. 14. Because of this, the Court gives no weight to Ex. 15.

[4] The parties stipulated that $76,000 was paid to PEI at the time Plaintiffs signed the Contract.  Presumably these funds were used to pay PEI's fees or for work on the Project that was not included in a Draw Request.  If not, then Plaintiffs paid $567,850 for $619,515 of work on the Project.

perform as promised.[5]  It is equally clear that the subcontractors suffered substantial harm.
Whether Defendant's statements and actions should result in a determination of
nondischargeability in favor of Plaintiffs, however, is another issue.

Plaintiffs contend that Defendant misrepresented in a Draw Request that he had used all
prior Construction Loan proceeds to pay subcontractors when, in fact, he had not done so.
Specifically, each Draw Request contained the following certification:  "all amounts previously
disbursed by [PEI] for labor, services and/or materials for the [Project] pursuant to previous
Draw Requests have been paid to the parties entitled thereto."  *See, e.g.*, Ex. 4 at ¶6.  To be
actionable under §523(a)(2)(A), a representation must be false or misleading when it is made.
*Matter of Sheridan*, 57 F.3d 627, 635 (7th Cir. 1995).  For the reasons that follow, the evidence
failed to establish that Defendant submitted a Draw Request containing this representation after
he failed to pay subcontractors or at a time he knew he had not paid subcontractors.

Plaintiffs learned that subcontractors had not been paid sometime in September 2007
when they were notified that 84 Lumber was preparing to file a lien against the Project.  The
exact date is not clear in the record.  Nor is there any evidence that Defendant knew 84 Lumber
had not been paid before Plaintiffs learned of it.  Only one Draw Request was submitted during
or after September 2007: the Draw Request submitted September 17, 2007 in the amount of

---

[5] The total amount paid by Plaintiffs for the work to be performed under the Contract cannot be determined from the record.  The parties stipulated that $76,000 was paid to PEI at the time Plaintiffs signed the Contract.  Augustine testified he paid $25,000 for kitchen appliances and $4000 for lighting fixtures for which he was not reimbursed.  Adding these amounts to $491,850 results in a total of $596,850, or $168,150 below the Contract Price of $765,000.  Augustine testified that he entered into a contract to complete the Project for $265,000.  But he testified there were many additions on the replacement contract that were not in the Contract.  These additions were not identified or quantified.  Thus, on this record, the amount by which Plaintiffs paid in excess of the Contract Price for the work to be performed under the Contract could be from zero to $96,850 ($596,850 plus $265,000 minus $765,000).  In any event, this analysis does not take into account the unpaid subcontractors' claims.  The exact amount that Plaintiffs paid in excess of the Contract Price for the work to be performed under the Contract is more pertinent to a breach claim than a dischargeability claim.  It is included here to show that the subcontractors suffered the most harm, and that Plaintiffs' harm, if any, is not determinable from the record.

$24,545.  *See* Ex. 12.  That Draw Request was paid in the amount of $3,435 on September 24, 2007.  *See* Ex. 14 at "page 5," entry for "09/24/2007."  At most then, and assuming Defendant learned that 84 Lumber was not paid before he submitted the September 17 Draw Request, the amount of any nondischargeability determination under this theory would be limited to $3,435.  But Plaintiffs failed to establish that Defendant learned that 84 Lumber (or any other subcontractor) had not been paid from a previous Draw Request before he submitted the September 17, 2007 Draw Request.  Therefore, Plaintiffs did not establish that Defendant knew the representation in the September 17, 2007 Draw Request was false when made.

Plaintiffs next state that, prior to entering into the Contract, while Plaintiffs were sitting in their previous house and discussing the Project with Defendant, Defendant told Plaintiffs he would build them a house as nice or nicer than their current home.  Defendant contends this statement is sales "puffing" and not actionable.[6]  Even assuming the statement is actionable, it addresses only the quality of the work to be performed by Defendant, not the cost.  Plaintiffs do not challenge the quality of the work.  Therefore, this statement cannot serve as the basis of a §523(a)(2)(A) claim.

Plaintiffs next state that Defendant told them they would be reimbursed from the Construction Loan for kitchen appliances they purchased and for $4000 of lighting expenses, and they were not reimbursed.  They contend that Defendant's statement was a misrepresentation that is actionable under §523(a)(2)(A).  This contention fails.

---

[6] "Puffing: The expression of an exaggerated opinion – as opposed to a factual misrepresentation – with the intent to sell a good or service. Puffing involves expressing opinions, not asserting something as a fact.  Although there is some leeway in puffing goods, a seller may not misrepresent them or say that they have attributes that they do not possess."  *Black's Law Dictionary* (8th edition 2004), p. 1269.

Here, the evidence failed to establish that at the time the Contract was signed, when Plaintiffs were told they would be reimbursed for these amounts, there was any basis to conclude that Plaintiffs would not be reimbursed.  Nor was there evidence sufficient to establish that Defendant knew the statements were false or misleading at that time or at any time before Countrywide announced it would no longer advance funds under the Loan.

Accordingly, the Court will enter an order dismissing the §523(a)(2)(A) claims.

**Section 523(a)(4)**

Plaintiffs contend that Defendant committed "fraud or defalcation while acting in a fiduciary capacity . . ." and, therefore, their debt should be excepted from discharge under §523(a)(4).  To prevail under this provision, a creditor must ordinarily make a two-part showing: (1) that the debt at issue arose while the debtor was acting in a fiduciary capacity; and (2) that the debt arose from the debtor's fraud or defalcation."  *In re Strack*, 524 F.3d 493, 497 (4th Cir. 2008) (citation omitted).

"The scope of the term 'fiduciary capacity' is a question of federal law, although state law is considered in the inquiry."  *Collier on Bankruptcy*, (16th Edition 2010), Vol. 5, p. 523-73, ¶ 523.10[1][d] (citing cases); *see also Strack*, *supra*, at 498 (citing *Am. Bankers Ins. Co v. Maness*, 101 F.3d 358, 363 (4th Cir. 1996)) (same).  In the context of a §523(a)(4) claim, the term "fiduciary" is narrowly construed, *i.e.*, if the applicable state law "does not clearly and expressly impose trust-like obligations on a party," such obligations will not be assumed and there is no fiduciary relationship.  *Collier*, *supra*, at *id.* (citing cases).  "If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created."  *Strack*, *supra*, at 499 (citation omitted).  Only technical or express trusts establish a

fiduciary relationship, not those which are merely implied from a contract.  *Davis v. Aetna Acceptance Co*., 293 U.S. 328, 333 (1934).

       *1.   Effect of Submitting Draw Requests*

Plaintiffs argue that Defendant was their agent because he was authorized to submit on their behalf the Draw Requests to Countrywide.  Consequently, according to Plaintiffs, a fiduciary relationship arose between the parties, which imposed on Defendant the obligation to ensure that all draws submitted were accurate as to the representations made with regard to how previous draws had been disbursed.  Plaintiffs cite no legal basis for the argument that a mere agency relationship is sufficient to establish the "fiduciary capacity" required by §523(a)(4).  The Court concludes that, even assuming the Draw Requests made Defendant Plaintiffs' agent, this is an insufficient basis to establish a fiduciary relationship for purposes of §523(a)(4).

       *2.   Maryland Custom Home Protection Act*

Plaintiffs contend that Defendant took draws from the Construction Loan and failed to pay subcontractors in violation of the Maryland Custom Home Protection Act (the "MCHPA"), Md. Code §10-501 *et seq*.  The parties stipulate that the MCHPA applies in this case.

In relevant part, the MCHPA provides:

> Any consideration received by a custom home builder in connection with a custom home contract shall be held in trust for the benefit of the buyer. Payments made to subcontractors or suppliers in connection with the custom home contract shall be consistent with the trust.

Md. Real Prop. Code §10-502.

> Except with the written express approval of the buyer not to pay, in the event a subcontractor or supplier fails, in the opinion of the custom home builder, to perform in accordance with the contract between the subcontractor or the supplier and the custom home builder, the failure of a custom home builder to pay or cause to be paid the lawful claims of any person furnishing labor or material, including fuel, within a reasonable period after the receipt from the buyer of

> consideration paid to satisfy the claims, shall create a rebuttable presumption that the consideration received by the custom home builder has been used or appropriated in violation of the trust established by this subtitle.

Md. Real Prop. Code §10-503.

The evidence at trial established that Defendant received Construction Loan proceeds that were intended under the Draw Requests and Construction Loan documents to be paid to the subcontractors, and that he did not in fact pay those subcontractors. Defendant contended that this was due to "clerical error" but the Court gives little weight to his testimony. The initial issue, then, is whether the statute establishes a trust relationship sufficient to find that Defendant was acting in a fiduciary capacity for purposes of §523(a)(4).

There is conflicting case law in this district as to whether the MCHPA satisfies the requirement of §523(a)(4) that the debtor was acting in a fiduciary capacity. In *In re Marino*, 115 B.R. 863 (Bkrtcy.D.Md. 1990), Judge Derby held that "[t]hese provisions create a technical trust in favor of the buyer/owner," and, therefore, "the violation of this trust could satisfy the fiduciary capacity requirement of 11 U.S.C. §523(a)(4) for denying dischargeability of a debt created thereby as to a buyer/owner." *Id*. at 869. [7] On the other hand, in *In re Heilman*, 241 B.R. 137 (Bkrtcy.D.Md. 1999), Judge Schneider also addressed, *inter alia*, the issue whether "a debt arising from a violation of the Maryland Custom Home Protection Act is excepted from discharge because the statute created an express trust." *Id*. at 152. He ruled that a trust created by statute is by definition not an express or technical trust that can satisfy the "fiduciary capacity" requirement of §523(a)(4), even if that trust "exists in advance of a default, identifies a res and provides that it be held in trust by one party for the benefit of another." *Id*. at 160-161.

---

[7] Judge Derby also cited Md. Code §10-504, which "requires the custom home builder to deposit advance payments of more than 5% of the contract price into an escrow account, from which withdrawals may be made only for designated purposes." *Marino*, 115 B.R. at 869.

13

The Court need not choose between these conflicting views. The evidence at trial established that, while Defendant failed to pay subcontractors from the Construction Loan proceeds, Plaintiffs were not required to reimburse or pay the subcontractors for the unpaid amounts. To be sure, the subcontractors were supposed to be paid from the Construction Loan proceeds and did work for which they were not paid. The subcontractors clearly suffered a loss, but that loss was not borne by Plaintiffs – they did not pay the subcontractors for the unpaid work. Plaintiffs are in no different position, *viv-a-vis* the Construction Loan, than if Defendant had paid the subcontractors from the Construction Loan proceeds for the work: The work was performed and the funds were advanced to pay for it. The parties who performed the work, the subcontractors, were harmed, but Plaintiffs were not. Thus, Plaintiffs did not suffer any damages as a result of Defendant's breach of the MCHPA, and have no claim under the MCHPA.

Plaintiffs do not vigorously dispute this point; they do contend, however, that they paid $12,744 in attorney's fees to resolve the subcontractor claims and those legal fees should be considered as damages. Plaintiffs do not cite any authority for this request. Based on the relevant law, as discussed below, the Court concludes that there is no basis on which it can award Plaintiffs attorney's fees for the violation of the MCHPA in this case.

The relevant section of the Md. Code provides:

(a)  In addition to any other penalty provided elsewhere in the Annotated Code, any conduct that fails to comply with this subtitle, or any breach of trust created by this subtitle, is:
    (1)  An unfair or deceptive trade practice within the meaning of Title 13 of the Commercial Law Article [Md. Code §§13-101 *et seq.*]; and
    (2)  Is subject to all of the provisions of that title except §13-411 [criminal penalties] of the Commercial Law Article.

Md. Real Prop. Code §10-507(a).  The relevant provision of the Commercial Law Article is §13-408 which, in relevant part, provides:

* * *

> (b)   Any person who brings an action to recover for injury or loss under this section *and who is awarded damages* may also seek, and the court may award, reasonable attorney's fees.

Md. Commercial Law Code §13-408(a) (emphasis added).

The statute plainly distinguishes between damages, on the one hand, and attorney's fees, on the other.  By its terms the statute allows the award of attorney's fees only to a person "who is awarded damages."  The Court, therefore, must deny Plaintiffs' request for the attorney's fees incurred in addressing the subcontractor claims resulting from the violation of the MCHPA because Plaintiffs did not suffer actual damages from those claims.  *See DeReggi Construction Co. v. Mate*, 130 Md.App. 648, 665 (Md.Ct.Spec.App. 2000).

## CONCLUSION

For the foregoing reasons, the Court will deny relief and dismiss the complaint with prejudice.

**Copies to:**

Stephen K. Carper, Esq.,
Clapp & Carper, LLC
One West Church Street
Second Floor
Frederick, MD 21701

Edward and Lisa Augustine
8170 Hollow Road
Middletown, MD 21769

Jeffrey M. Orenstein
Goren, Wolff & Orenstein, LLC
Shady Grove Plaza
15245 Shady Grove Road, Suite 465
Rockville, MD 20850

James Paul Pare
9101 Hendry Terrace
Frederick, MD 21704

Office of the U.S. Trustee
6305 Ivy Lane
Suite 600
Greenbelt, Maryland 20770

**End of Memorandum of Decision**